Good morning, ladies and gentlemen. Our first case for this morning will be the International Union of Operating Engineers against the Village of Lincolnshire. Mr. Hubert? May it please the Court. A majority of states across this country have enacted laws that prohibit employers from requiring their employees to join or give money to a union as a condition of their employment. In 2015, the Village of Lincolnshire, Illinois enacted its own right-to-work ordinance for its local jurisdiction. There's no dispute that the right-to-work laws that states have enacted on a statewide basis are not preempted by the National Labor Relations Act. The question in this case is whether the National Labor Relations Act nonetheless preempts a right-to-work law enacted by a political subdivision of a state. You know what troubles me about your position? Obviously, you have a language issue in the statute, but the United States and the state of Illinois alone, of course the state of Illinois is not among the states that has enacted a statewide right-to-work law, or we wouldn't be here, of course. But there are nearly 7,000 local government units, and it seems quite inconsistent with the normal preemptive power of the National Labor Relations Act to think that the board would need to certify one bargaining unit for Lincolnshire and essentially have 7,000 bargaining units in the state of Illinois. One says yes, right-to-work. One says no, right-to-work. One says we go by the location of the employer. Somebody else says we go by the location of the job. The job may last three months. The job may last seven years. It seems to me that you are proposing to, by saying that the word state includes localities, to destroy a national system of labor relations. Respectfully, Your Honor, I don't think that that would be the consequence. Why not? What if there's a job that's going on in Lincolnshire, okay, and it finishes? And the next job, let's assume for the sake of argument that Hinsdale does not wish to have a right-to-work law. So Hinsdale has no right-to-work law. Hinsdale has no place for people working, so go ahead. Come on. They're building a new middle school right now in Hinsdale, so there's a job underway in Hinsdale. So what happens to the contract? Maybe there was right-to-work while the job was going on in Lincolnshire, a hypothetical job, and there is no right-to-work ordinance in Hinsdale. So does the union change its contract every two or three months, or what happens? No, I don't think that's how it would work. I think it would work like it works federally, where whether a right-to-work law affects a given employee would depend on that employee's primary job situs. And if an employee primarily works in a place that has a right-to-work ordinance, then their employer would not be allowed to force them to join the union. No, but understand that when it's only states that we're talking about, we only have 50 states. We have the District of Columbia. We have a few miscellaneous territories, probably not more than 55 jurisdictions to worry about. And bargaining units are defined very much along traditional lines, such as state lines. People know, there's legal certainty about what regime they're faced with. Yes, right-to-work law, no right-to-work law. I think under your system, that knowledge would be impossible. Well, the states can decide for themselves how far a local government's jurisdiction reaches. But there you're flipping the burden, because the background law under the NLRA, before you think of 14b, is that a union shop is okay, that people can be required to pay fair share dues, etc. So the background rule is you don't need to enact a law saying, yes, we are a union state, so to speak. We are not a right-to-work state. 14b, of course, says if a state wishes to have a right-to-work law, it may do so. And as you point out, a number of states have done that. That's fine. That's their right. But there is no obligation for a state to line up through state legislation on one side or the other. There's a presumption unless there's a 14b statute. Well, the presumption is that the federal government tolerates union security agreements to the extent that they're allowed under state law. No, but the back – no, I wouldn't phrase it that way. I would say the background rule is that a union security agreement is part of the give-and-take of the bargaining process. In one particular bargaining process, maybe the parties don't agree to one. In another bargaining process, maybe the parties do agree to one. But you need to opt out of that under 14b, as some states have done, half of them, you know, give or take. Well, Illinois has delegated some of its power to its home rule units, such as the Village of Lincolnshire. That's not about national labor policy, though. Of course, the Village of Lincolnshire can do certain things under its home rule authority. But there's nothing that says as a matter of federal law the Village of Lincolnshire can destroy the national policy that allocates bargaining units, that allocates subjects of bargaining. I just don't see it. I think you're creating a system of massive chaos. Well, the Supreme Court has said that where a statute gives power to the states to enact a particular type of law, we assume that also authorizes the states' political subdivisions to enact that same type of law. Now, there you're relying on these cases from quite different areas, though. The Supreme Court also says we need to start with the language of the particular statute that we're dealing with. You're looking at Mortier and Ours Garage, which are quite different statutes that allow states to speak up. Nonetheless, Your Honor, it does preserve – in a particular way in the NLRA that states can speak up, which is by passing a statewide right-to-work law. Well, the statute doesn't say that they have to pass a statewide right-to-work law. It simply leaves policy decisions – It says states, and other parts of the statute do refer to localities. Nonetheless, Your Honor, the Supreme Court has been clear in saying that if you authorize a state to do something, we presume that the state retains its ability as a sovereign to delegate its power to its local governments. But they don't presume that in the face of language of a federal statute. There is no sweeping rule that says if a federal statute – So here's a good example in the environmental area. Under various environmental laws, there need to be state implementation plans that set up the way that, say, clean water regulations will be handled, that set up the way the Clean Air Act will be administered. There is no provision in those statutes for Lincolnshire as a home rule city to go to the EPA and say, we've decided we want the Lincolnshire implementation plan, not the Illinois implementation plan. The federal statute operates at the state level. I can't speak to those statutes because I'm not familiar with the details of that, but I do know that – Trust me, there's a state and there's a SIP, horrible acronyms, and there have been issues about Indian tribes, which has been sort of a sidelight. And your cases involve FIFRA, that's the Mortier case, and the Interstate Commerce Act. But we also have cases such as Nixon versus Missouri Municipal League, where the Supreme Court says that if Congress intends to interfere with the state's authority, with the state's internal arrangements for how it's going to exercise its power, you need an unequivocal, unmistakably clear statement from Congress that that's what it was intending to do. And we don't have any statement like that here. All we have is something that says that states can do this. And the presumption is, if Congress hasn't said otherwise, states can delegate their power. And Illinois has made a policy decision through the home rule provisions of its Constitution that says that they have very broad powers for their local jurisdictions unless – You're saying we've decided not to follow the NLRA, or we've decided not to follow the Sherman Act, or we've decided not to follow, you name it, the Clean Air Act? Of course, under the Supremacy Clause, Illinois has to comply with federal law. And could Illinois pass a statute saying it's up to each home rule municipality in Illinois to decide whether to follow these various statutes? Not with respect to whether to follow the statutes. But if the state has authority to do something, it does presumptively have the authority to delegate that power to its political subdivisions unless – But it doesn't have the – well, I think you're using the idea of delegated power in a way that is not consistent with the NLRA. The power to monitor emissions from a smokestack is one thing. The power to change national labor policy is quite another. I don't think it changes national labor policy because the NLRA says that it's staying out of the question of union security agreements. It does not say that. It says states may have union security agreements unless they opt out. That's correct. The federal government has no hostility to it. But the analysis in the Algoma Plywood and the Schermerhorn cases makes clear that Congress just intended to suffer a medley of philosophies on the subject, as the Supreme Court put it, and not pursue having union security agreements or not having union security agreements. And as the Supreme Court recognized reviewing the legislative history in Schermerhorn, the only point of 14b was to make clear Congress's intention that the NLRA never preempted right-to-work laws. It was always something that Congress intended to stay out of. Well, your argument's a little inconsistent on that in your brief, but we can assume that the Taft-Hartley Act was at least clarifying, if not changing. There were plenty of signals in the legislative history that this was not so clear. Well, in any event, the cases like Nixon v. Missouri Municipal League say that you need a clear statement from Congress, and we just don't have that clear statement here. So you think Congress meant for 90,000 different local government units in the United States, each to have their own policy on right-to-work? They intended to leave that to states to resolve as they would, and as this Court has noted— But see, there you have it. There you have it. You're putting the burden on the state to pass a law saying how its municipalities are going to handle their authority under the NLRA. Well, the states essentially put that burden on themselves if they give their municipalities broad home rule powers. When they give their municipalities home rule powers, they contemplate that those municipalities might do things that the state legislature wouldn't be willing to do for the state as a whole. So you really don't think that if Lincoln Shear has right-to-work, and if Hinsdale says we don't want to have a right-to-work ordinance, and Elmhurst has a right-to-work ordinance, and Naperville doesn't have a right-to-work ordinance, and Melrose Park has a right-to-work ordinance, and on and on, and job locations, primary job locations shift month to month to month to workers, that that would not be disruptive of the national labor policy? I think employers and unions would figure out how to comply with this law. How? That's a facile answer. I mean, how? As they figure out how to comply with other local laws that regulate employment relationships. So you have to have a different contract every couple of months? That's inconsistent with collective bargaining. I don't think you do. I think contracts can anticipate where work will be performed and can apply to either right-to-work jurisdictions or non-right-to-work jurisdictions. So a couple months of the year, your clients, the people who don't want to be union members, don't pay any dues, and then the next couple of months, because they're working in a place that doesn't have right-to-work, they can be compelled to pay fair share dues, and then a couple of months later, they're back out of the union. I don't think it would work like that. I think it would work on the employee's overall primary job situs, just as it doesn't. But there isn't one, not in northern Illinois. Well, if there's no primary place that they work that is a right-to-work jurisdiction, then the right-to-work law wouldn't apply to them. The right-to-work law would apply to people who get up every morning and go to work in a business that's in Lincolnshire. And, of course, the purpose of this ordinance is to attract businesses to locate in Lincolnshire. So that's primarily who the- Lincolnshire is 7,000 people. Is that right? That sounds right. I couldn't say for sure. I think the brief said something in that zone. Okay. And so to the extent there's any unclarity about who Lincolnshire's ordinance applies to and so on, the state court should be capable of figuring this out. And if it is chaotic, if that were true, then the state government, certainly the legislature, could always step in and say, we didn't intend this, pass a law, and put a stop to it. But the point is that it's their policy decision. And if people think it's bad for Home Rule units' powers to include the power to enact right-to-work laws, then the appropriate place to go with that argument is to the state legislature. So you can't get away from your position then that no state that has not affirmatively enacted legislation prohibiting right-to-work laws can maintain a consistent state policy? Many states do not have Home Rule provisions that are- But many do. If they do have Home Rule, if they give their governments, local governments, Home Rule powers as broad as Illinois does, then yes, they would be in that same situation. But you agreed that a Home Rule power would not allow, for example, to take the analogy that has been offered in the briefs from the antitrust laws, where there's affirmatively articulated state policy and active supervision under the Parker v. Brown doctrine. You would agree, I believe, that municipalities can't do that, even though the Sherman Act is about four lines long, and yet it satisfies the clear statement. Well, the Sherman Act cases aren't about federal preemption of local laws. They're about exemptions from the rule for state action. They're about whether municipal action, whether the state essentially can delegate its power to substitute a system of regulation for a system of competition to a municipality. That's why the analogy is offered. The state is not allowed to delegate that in the Sherman Act area. Since there's no question pending, I'll remind you that you're running into your rebuttal time. Thank you, Your Honor. Yeah, you're certainly free to use it as you wish. Again, the Sherman Act cases don't involve federal preemption of local laws. They involve exemption for state action from liability under the Sherman Act. But the delegation point is the one I want you to focus on. Maybe you can say more about that on rebuttal. All right, I will. Thank you. Sure. Mr. Koppus? Yes. May it please the Court. In 1947, when Congress undertook to amend the National Labor Relations Act, it made fundamental changes in the system of regulation. Prior to that, unions weren't regulated at all. The unfair labor practice provisions only ran against employers. And beginning in 1947, the regulation became comprehensive for both. I have a question for you. Do you think that if the state of Illinois wanted to pass a law saying, we've decided to allow union security clauses north of I-80 but south of I-80, we're going to be right to work, could the state pass that statute? Well, then you would have a question like the Supreme Court addressed in Mobile, where they were dealing with the state law. Is that yes or no? Pardon me? Is that yes or no? I don't know. It would be a question at that point of whether the sort of limitation that the Supreme Court applied to the Texas law would keep Illinois from doing that for the same sort of considerations. In Mobile, the Supreme Court said 14B needs to be interpreted so that people will know where they stand. And so that's where you get the primary work idea from. Pardon me? That's where you get the primary place of work. Right. So can you tell me if right now under the normal regime, under the National Labor Relations Act, are bargaining units drawn with state lines in mind at all where you've got, say, here Wisconsin is right to work, Illinois is not, Indiana is right to work? No. And you do have some bargaining units that span states. So you would have some bargaining units where you could have the union security clause in effect and some where you couldn't. And that allows a certain amount of confusion in those instances, but not the level of confusion we would have if every little locale did. And there's two things I would say about that. One is Congress cabined the amount of confusion in 14B itself because it the statutory phrase is in any state, and that's where the primary job status test comes from in the federal law. So the federal law provides a clear rule of limitation, so you only end up with border problems between Illinois and Indiana. But once you're within the state, you have no federal rule limiting it as the village admits. You're throwing back on state law, village law, whatever, and if you just look at the ordinance here, the ordinance here seems to contemplate three rules of application. Place of hiring for its hiring hall provision, employer location for its dues checkoff provision, and who knows what for its union security provision. The district judge tried to simplify it by applying a job status test, and I'll add he had a really difficult time applying that because of where everybody was. But even with that simplification, it's very hard, and it's not provided by the federal law. The village admits that. And so the idea that Congress would have cabined the law on the state level by drafting 14B as it did and then meant to allow chaos within the state is really very counterintuitive, particularly when you consider that the reason Congress gave for allowing negotiation of union security at all was in the interest of industrial stability. That's what Senator Taft said. It doesn't help industrial stability to have the unions and the employers not know where they stand. That may be, but your opponents argue that, at least in other contexts, the Supreme Court has said that when Congress allows a, quote, it doesn't really care how the state accomplishes that goal. The state might accomplish that goal through state-level legislation. The state might accomplish that goal through a wholesale delegation of power to all municipalities or other governmental units in the state, of which, of course, Illinois has an abundance. The state might say, you know, we'll do it at the state level except insofar as there are home rule jurisdictions, of which there are many, again, in Illinois. So how do you get from the fact that this is certainly true some of the time to say it's not true here? Well, what the court said about that, the provisions in Mortier and Ars Garage point the other way here. In Mortier, there was nothing to suggest federal preemption other than the exemption for states. And what the exemption said, it wasn't drafted as this one is in terms of preserving laws that Congress knew about. It said states may regulate. And the Supreme Court said, well, taken by itself in the language and the words they used, they said that tilts towards allowing the local governments to do it. But in Mortier, the court emphasized that that was against a background of no other basis for federal preemption, in particular, particularly not the sort we have in the NLRA where there's comprehensive regulation. So just as a practical point, Mortier is about pesticide regulation. So is it your position that, you know, if somebody wants to spray a certain kind of mosquito abatement substance in Lincolnshire and they don't want to use that particular substance in Hinsdale, that's feasible? I mean, I'm just trying to see whether there's a pragmatic difference in terms of the ability for each locality to opt for whatever system it sees best. Well, whether that makes more or less sense, it sounds like that's what they're allowing. But the distinction I would draw between that situation and this is that there the sprayer has a safe harbor. They know they can obey the law by simply not spraying. That's not the case here. If an employer is trying to decide whether it has to bargain over a union security proposal and there's a village ordinance that says you can't, if the employer obeys the ordinance, they risk violating the federal law because they have a duty under the federal law to bargain if that ordinance doesn't bar it. And the consequences can be very severe. It can affect the whole bargaining situation. So if the bargaining unit is bigger than Lincolnshire, is it your argument that they would be violating federal law by failing to bargain about a union security clause for people in other municipalities that abut Lincolnshire? Well, they certainly would there, but they might even be violating it in Lincolnshire if the Lincolnshire ordinance doesn't apply or it's not valid. So there's no safe harbor. And if the idea is to allow labor fees so the union and the employer can bargain and know where they stand, that does not facilitate that. Now, as I read Section 4 of the village's ordinance, it doesn't prohibit people from being union members in ordinance. It just says they can't be required to have a union security clause, right? Right. Which also suggests that maybe bargaining over a union security clause for those who wish to have one might not violate the ordinance? Well, I mean, I'm pretty sure that would violate the ordinance wherever the ordinance applies because it would be a contractual requirement. Even if the ordinance said union security for such and such business in Lincolnshire applies for any work done outside the village of Lincolnshire? I mean, yeah, there's no limiting principle. I mean, all you have to do is look at the various opinions and the various levels of the court in mobile oil. When you get to conflict of law and due process considerations, there are all kinds of contacts you could look at. Place of hiring makes sense, where the payroll is cut, where people report, where they spend most of their work time. You don't know what the role of application is within the state. You do know what the role of application is between states because the federal law has stated one, and that suggests that Congress was doing what this court said it was doing, describing existing laws. It had 12 laws it was looking at, and it said, we don't want to knock down those. And then it wrote the provision not in terms of regulatory authority but in terms of describing those laws, and that's what it was doing. And one thing I want to also add here, because I think it's very pertinent, three years later when Congress amended the Railway Labor Act and it was dealing with nationwide bargaining units, because that's what the statute applies, they said, no, we're not going to allow state right-to-work laws because it would be too much of a mess. But your opponents point to that and say, but they could have said that in the Taft-Hartley Act too. Well, they tolerated a certain amount of mess. That's what they said. We've got 12 states with laws on the books. People live with it. And we don't want to knock them down. But all I'm saying is... But you don't have the clear... I mean, I know you've got some hints, I'll say. Maybe they're strong hints. But in the language of the National Labor Relations Act as amended itself, whether it's 14A talking about localities instead of states, or you have some other places that you've pointed to, right? Statutory language. Fair Labor Standards Act, they talk about municipal ordinances. They talk about political subdivisions elsewhere in the NRA. But if your point is that there's no clear language in the statute, that's not the rule. The phrase that Moitra relies on and that people keep coming back to in Nixon and all these cases is clear and manifest purpose. And that comes from Rice v. Santa Fe Elevator Company. And so what the court says there is, in an area of traditional authority, we're not going to assume the federal law overrides it absent a clear and manifest purpose. The next sentence says that can be shown in many ways. And the very next sentence says one of the ways that can be shown is comprehensive federal regulation. And you most certainly have comprehensive federal regulation here. Even within the area of union security, as the court makes very clear in Schermerhorn, a state cannot prohibit a union from striking, picketing, exerting economic pressure to get an agreement that would violate the state law. It's very clear that the Supreme Court says that is not within the state's authority. That's within the federal authority. Mobile oil holds that even when there is an undeniable state right-to-work law, federal law limits the application of that right-to-work law, even though there were many contacts that would have allowed the state to apply its law under normal conflict principles and due process principles. So the federal law is all over the gestalt, and it's also all over this issue too. All it does is preserve laws that Congress knew about, and local ordinances were not among those. Well, I mean, the difficulty is, again, we have this complex federal system, and we have a statute that doesn't address the fact that some states, even at the time the Taft-Hartley Act was passed, did confer essentially state-level regulatory power on certain municipalities, the home rule authority. Well, not at the time it didn't. Home rule was not a thing in 1947. It only became something that municipalities did in the 50s. But Congress drafted 14b as an exception, an exception to regulatory preemption. And what the Supreme Court said in Mortier is that when you have an exception that hands back authority that's already been taken away, it makes sense to read that narrowly. And so it should be written as an exception doing what it so obviously was intended to do, preserving a particular kind of law that Congress knew people had lived with for a short period of time and that Congress didn't want to knock down. But it also wanted to foster industrial peace, and I think it's just undeniable that if you throw this all back on Illinois law, I mean, you're going to end up with a mess. People will not know where they stand, and it has dire consequences for the whole bargaining process. All right, let me ask you a different question. I understand you to be essentially arguing that we should create a conflict with the Sixth Circuit, although I gather also that the Supreme Court of Kentucky, if I'm remembering, has decided this in the direction that you are advocating. So, you know, we don't create conflicts lightly. Why should we do that? Well, I think the reason you should is that the Sixth Circuit, as the village candidly points out, the Sixth Circuit agrees with us on much more of this argument than it agrees with the village. It agrees with us... Well, it's just the hiring hall and the checkout, right? Well, no, but also on the core issue, the Sixth Circuit agrees with us that there's field preemption and that 14b is an exception to field preemption. So what it comes down to in the Sixth Circuit is that court places all of its reliance on a very strong reading of Moore TR and Ars Garage as creating pretty much not an irrebuttable presumption, but a presumption that needs to be negated by clear statutory language so that whenever the word state is used, it has to be a red local government. With due respect to the Sixth Circuit, I just don't think that Moore TR and Ars Garage bears that weight. In fact, I think that if they're read carefully, they point in the direction that the Kentucky Supreme Court took. So, of course, from the Supreme Court point of view, there's already a conflict on these issues. There is, there is. So one could just line up on one side of it or the other. Right. You've got the highest court of a state, and I really do think it's a very succinct opinion in the Kentucky Court of Appeals, but I think that it actually is correct and lines up with Moore TR and Ars Garage for the reasons we point out in our brief. And I just think that the Sixth Circuit way overread those two cases. If there are no questions, thank you. All right. Thank you very much. Mr. Hubert. The National Labor Relations Act in Section 14B didn't just authorize states to do exactly what they have always done. This court recognized in the Sweeney v. Pence decision that the authority that states have under 14B is extensive and broad, and so states could decide that they want one region of their state to be right to work and another region not right to work. There's no evidence that Congress intended to preclude that, and states commonly have different policies for different parts of their state. This court has recognized that states may have a rational basis for doing that, and if they can do it centrally, then presumably they can do it by delegating authority to local governments, which may have a better sense of what's best and what's desirable for their local jurisdiction. And it's not true that you don't need a clear statement from Congress. The Nixon case, which cited Moore TR and Ars Garage, said you need an unequivocal, unmistakably clear statement that Congress intended to interfere with the state's authority to order its own government and divide up its powers. And so in the absence of that statement, we have to presume that there's preemption. Also, it's not true that Moore TR and Ars Garage said that if you have an exception that hands back authority, the exception should be read narrowly. Moore TR said that even if there were preemption in that case, the court would still have to look at the word state, and the word state would still implicitly encompass the state's political subdivisions by definition. And in Ars Garage, the court was actually considering an exception to an express general rule of preemption, not just the implied preemption that the unions are arguing for here, but express preemption that Congress had stated. And nonetheless, the court declined to read the word state narrowly in that context because, again, there was no clear statement from Congress, and that's what the Supreme Court requires. The Supreme Court's beginning in any sort of preemption analysis is that you start with the assumption that states retain their power, and you need something to overcome that. And you start with the language of the statute. Do you want to say anything about machinist preemption? Yes. Machinist preemption exists where the government has left something entirely to the negotiation of unions and employers, and no level of government, federal or state, can interfere with that. Garmin preemption, on the other hand, is where something is in the federal government's jurisdiction but has been denied to the states to regulate. And here the unions are arguing for Garmin preemption. I think they also argued for machinists. I mean, I looked carefully at the district court filings. The district court judge thought it was just Garmin, but I'm not sure the judge was correct about that. Well, if it were machinist preemption, then it would be the case that everybody is always free to just negotiate union security agreements. But here the unions are saying, well. In states with no right to work law. Right. And if there's no right to work law, then any union security agreement is governed by federal law and the restrictions that federal law places on union security agreements, particularly the fact that it can't take effect for 30 days. And so there's a choice here between is there going to be state regulation or is there going to be federal regulation. And so that's a Garmin preemption situation, not a situation where the federal government has said government is just staying out of this and this is a right that governments cannot infringe that we're creating here. My time is up. If you'd like to wrap up, that would be fine. All right. Again, because the plaintiffs have not met their burden to show that there's a clear intention by Congress to preempt local laws and interfere with state power, it hasn't done so, and the court should uphold the village of Lincolnshire's ordinance. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.